Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com

Jason Flanders (Bar No. 238007)
SAN FRANCISCO BAYKEEPER
785 Market Street, Suite 850
San Francisco, California 94103
Telephone: (415) 856-0444
Facsimile: (415) 856-0443
Email: jason@baykeeper.org

Attorneys for Plaintiff
BAYKEEPER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAYKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>HANSON AGGREGATES MID-PACIFIC, INC. and HANSON AGGREGATES, LLC.<br><br>Defendants. | Case No. C 11-01722 EMC<br><br><br>[PROPOSED] CONSENT DECREE |

## CONSENT DECREE

WHEREAS, Baykeeper is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay and other area waters;

WHEREAS, Hanson Aggregates Mid-Pacific, Inc. and Hanson Aggregates, LLC, (collectively "Hanson") operate various facilities where sand and other aggregate material is washed, processed, prepared, transported, and sold.  Hanson's facilities are located at 448 Amador Street in San Francisco, California ("the Pier 92 Facility"), Pier 94, Port of San Francisco in San Francisco, California ("the Pier 94 Facility"), and 4501 Tidewater Avenue in Oakland, California ("the Tidewater Facility") (collectively, the "Facilities") and shall hereinafter be referred to as "Hanson;"

WHEREAS, stormwater discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 92-12-DWQ (as amended by Water Quality Order 97-03-DWQ), issued pursuant to Section 402 of the Federal Water Pollution Control Act, 33 U.S.C. §1342 (hereinafter "Industrial Stormwater Permit");

WHEREAS, discharges associated with Hanson's sand washing activities at the Pier 92 Facility and Tidewater Facility are regulated by the San Francisco Regional Water Quality Control ("Regional Board") Board's NPDES Permit CAG98200, Order No. R2-2008-0011 ("Sand Washing Permit").

WHEREAS, on January 21, 2011, Baykeeper served Hanson, the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of the Regional Board, the U.S. Attorney General, and other individuals

1

and entities with a notice of intent to file suit ("60-Day Notice") under Sections 505(a)(1) and (f) of the Federal Water Pollution Control Act ("Clean Water Act" or "the Act"), 33 U.S.C. § 1365(b)(1)(A), alleging violations of the Act, the Industrial Stormwater Permit, and the Sand Washing Permit at the Facilities;

WHEREAS, Baykeeper filed a complaint ("Complaint") against Hanson in the United States District Court, Northern District Court of California on April 8, 2011;

WHEREAS, Baykeeper contends in its 60-Day Notice and Complaint that Hanson has repeatedly discharged polluted stormwater in violation of the Clean Water Act and discharged pollutants in violation of its Industrial Stormwater Permit and Sand Washing Permit and Hanson denies all allegations set forth in the 60-Day Notice and Complaint and contends that Baykeeper's Complaint should be dismissed,

WHEREAS, the Parties, through their authorized representatives and without either adjudication of Baykeeper's claims or admission by Hanson of any alleged violation or other wrongdoing, choose to resolve in full Baykeeper's allegations in the 60-Day Notice and Complaint through settlement and avoid the cost and uncertainties of further litigation;

WHEREAS, the Parties agree that it is in their mutual interest to resolve this matter without further litigation;

NOW THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:

## I.      COMMITMENT OF HANSON

1.      In order to reduce or prevent pollutants associated with industrial activity in stormwater and authorized non-stormwater, and to eliminate any unauthorized non-stormwater discharges from each Facility into the waters of the United States, Hanson shall implement

2

appropriate structural and non-structural Best Management Practices ("BMPs") as required by the Industrial Stormwater Permit and as described more fully below.  In order to further reduce or prevent pollutants in discharges associated with Hanson's sand washing activities, Hanson shall take appropriate actions as required by the Sand Washing Permit and as described more fully below.

## II.   FACILITY COMPLIANCE MEASURES – STORMWATER

2.     **Site Maps**:  Hanson shall inspect its Pier 94 and Tidewater Facilities so as to complete site maps that comprehensively depict the flow of stormwater at the Facilities ("Site Maps").  The Site Maps shall clearly denote the direction of stormwater flow.  The Site Maps shall clearly identify the property boundaries, known or suspected drop inlets, ground type (pervious or impervious), berms and the materials they are comprised of, any permanent structures and features, discharge points, and all other physical structures or items relevant under the Industrial Stormwater Permit and in this Consent Decree.

3.     **Designated Discharge Points**:  To the extent not already implemented, Hanson shall identify on the Site Map for the Pier 94 and Tidewater Facilities every location at which stormwater and non-stormwater is known to be discharged or which may potentially be discharged ("Designated Discharge Point or Area").  To the extent not already implemented, each Designated Discharge Point or Discharge Area shall be numbered and clearly labeled on each of the Facility's respective Site Maps.

4.     **Designation of Process Areas**:  The portion of the Pier 94 and Tidewater Facilities where industrial processes occur, which may include: (a) preparation of trucks for loading sand and gravel; (b) loading of trucks with sand and gravel; (c) sand washing and aggregate processing; (d) loading or unloading of sand or gravel from barge or ship to the

3

Facility by conveyor belt; and (e) any other activities associated with the processing of sand at the Facilities ("Processing Activities"), will hereinafter be referred to, and be designated on the Pier 94 and Tidewater Facilities' respective Site Maps, as the "Process Areas." Hanson shall operate the Pier 94 and Tidewater Facilities such that Processing Activities described above that generate dust, fine particulate matter, or other materials that can be tracked or entrained in stormwater discharged from the Facilities are conducted within the Process Areas. Hanson shall include in its Site Maps for the Pier 94 and Tidewater Facilities a description of all industrial activities that occur in the Process Areas and where within the Process Areas these activities occur.

5.      **Designation of Storage Areas**:  The outdoor storage areas at the Pier 94 and Tidewater Facilities where sand, gravel, or other aggregate materials are stored will hereinafter be referred to as the "Storage Areas," and shall be designated on the Facilities' Site Maps as such.  Processing Areas and Storage Areas hereinafter shall be collectively referred to as "Operating Areas."

6.      **Dust Generating Activities**:  Hanson shall update the SWPPP and Site Maps for the Pier 94 and Tidewater Facilities to fully describe all industrial activities that generate dust or particulates that may be deposited within the Facility's boundaries; the characteristics of dust and particulate pollutants; the approximate quantity of dust and particulate pollutants that may be deposited within and outside the facility boundaries; and a description of the primary areas of the facility where dust and particulate pollutants would settle.  Hanson shall denote all actions taken to control the deposition of dust and particulate matter at the Facilities, including any sweeping activities, water spraying activities, addition of berms, covers, or straw wattles, etc.

4

7.     **Designation and Protocol for All Sampling Locations**: Hanson shall update the SWPPP for the Pier 94 and Tidewater Facilities to fully describe the protocol for taking stormwater samples.  The description shall be precise with respect to exactly where and when the samples are to be collected and shall further explain why the sample points are representative of off-site discharge.  For instance, if the discharge point is a driveway, Hanson shall specify which side of the driveway the sample is collected and determine if additional collection points need to be added on the driveway to ensure that the sampling program characterizes all the monitored constituents in the Facility's stormwater runoff.  At the Pier 94 Facility, Hanson shall designate the drop inlet currently marked as catch basin number 14 in the existing SWPPP as a sample point for stormwater sample collection in addition to the currently designated off-site drop inlets.

8.     **Best Management Practices**:  To comply with Effluent Limitation B(3) and Receiving Water Limitation C(2) of the Industrial Stormwater Permit and the Benchmark and Target Levels specified in Exhibit 1, Hanson shall implement the BMPs set forth in paragraphs 9 - 22 at the Pier 94 and Tidewater Facilities.

9.     **Storm Drain Inlet/Catch Basin Best Management Practices – Pier 94 Facility**:

a.     Prior to October 1 of each year, Hanson shall inspect each storm drain inlet at the Pier 94 Facility.  During this inspection, Hanson shall clean, as needed, each drain inlet in order to remove dust and solids that have entered the storm drain inlets.

b.     Twice per month during the Wet Season (*i.e.*, from October 1 to May 31 of each year that this Consent Decree is in effect) ("Wet Season"), Hanson shall inspect all storm drain inlets or catch basins at the Pier 94 Facility to ensure that the storm drain inlets or catch basins are not in a condition that would materially impair

5

their efficacy and clean out any sediment deposited into these storm drain inlets or catch basins. Hanson shall properly dispose of any dust, sediment, or other pollutants removed from storm drain inlets or catch basins.

      c.      Hanson shall cover the on-site storm drain inlet at Pier 94 Facility for the entirety of the summer months (June 1 to September 30) ("Dry Season") with a material that will prevent dust and solids from collecting in the storm drain inlet.

      d.      Within thirty (30) days of the Effective Date, at the Pier 94 Facility, Hanson shall supplement existing storm drain inlet protection measures for the on-site drain inlet by installing and maintaining gravel bag berms or weighted walnut wattles, consistent with specifications contained in the *California Stormwater BMP Handbook*. Such storm drain inlet protection measures shall be maintained around the on-site storm drain inlet to slow down the flow of stormwater and reduce the potential sediment and pollution load.

      e.      **Log of Storm Drain Inlet/Catch Basin Inspections, Maintenance and Cleaning:** Hanson shall prepare and maintain a log of the Storm Drain Inlet/Catch Basin Inspections, Maintenance and Cleaning described herein ("Maintenance Log"). The Maintenance Log shall indicate the staff who completed the maintenance activity and when it was completed. The Log shall be made available for inspection by Baykeeper at any site inspection or otherwise within two (2) business days advance request by Baykeeper.

10.    **Silt Fencing:** Within sixty (60) days of the Effective Date, at the Pier 94 Facility, Hanson shall install silt fencing along its eastern and southern property border. The silt fencing shall be sourced and installed along the base of the chain-link fence to a height of approximately

6

3 feet.  Silt fencing shall extend to the base of the fence and overlap directly adjoining straw wattles or berms, where applicable, which shall be retained and maintained.

11.     **Facility Monitoring**:  Prior to October 1 of each year, and monthly during the Wet Season, Hanson shall conduct inspections of those portions of the Pier 94 and Tidewater Facilities from which stormwater discharges.  Such inspections shall include driveways, and outdoor equipment storage areas, Storage Areas, hazardous material areas, and all Process Areas. All Designated Discharge Locations shall also be inspected for accumulation of dust, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facilities.  If any of these materials are present, Hanson will clean the area.

12.     **Site Sweeping**:  After the Effective Date, Hanson shall implement a sweeping schedule at the Pier 94 and Tidewater Facilities as follows: (a) at Pier 94, Hanson shall mechanically sweep all paved surfaces, including driveways, at the facility weekly, and the immediately adjacent roadways daily; and (b) at Tidewater, Hanson shall mechanically sweep all paved surfaces, including the driveway and adjacent roadways, three times per week.  If heavy rain or severe weather precludes sweeping at the exit on a particular day, the sweeping shall occur as soon as practicable thereafter.

a.      **Site Sweeping Log**:  After the Effective Date, Hanson shall keep a log or checklist, as appropriate, of the on-site (*e.g.*, non-roadway) sweeping activity performed at the Pier 94 and Tidewater Facilities ("Sweeping Log"), and shall direct employees and/or contractors to accurately complete this Log.  The Sweeping Log shall indicate the employee or contractor who conducted the sweeping, the location of the sweeping, and the dates the sweeping activities occurred.  The Sweeping Log

7

shall be made available for inspection by Baykeeper at any site inspection or otherwise within five (5) business day advance request by Baykeeper.

13.     **Traffic Flow:** Hanson shall update the SWPPP for the Pier 94 and Tidewater Facilities to fully describe the type, direction, and volume of vehicle traffic at the Facilities.

14.     **Tire Cleaning Mechanisms:**  Hanson shall continue to operate and maintain the tire/wheel washes at the Pier 94 Facility. Hanson shall install a "rumble rack" system, consisting of plates that are at least 8' x 10' in size and weigh at least 3,750 lbs., at the Tidewater Facility, immediately preceding the truck scale, so that trucks exiting the Facility will deposit readily available sediment prior to exiting the property, and Hanson shall maintain and routinely clean the rumble rack system to ensure the system is free of debris.  Hanson shall confirm installation in the updated SWPPPs for the Tidewater Facility submitted to Baykeeper.

15.     **Paving and Pavement Repair**:  At the Pier 94 and Tidewater Facilities, Hanson shall routinely inspect paved areas and implement repairs or replacement to damaged surface pavement on an as needed basis.

16.     **Berming:**  By October 1, 2011, Hanson shall install the following berms in discrete locations to direct stormwater flows to Designated Discharge Points, which shall also be indicated on Hanson's Site Maps.

        a.      At the Pier 94 Facility, a contiguous 4 inch high asphalt-type berm shall be installed along the southern, eastern, and northeastern border of the property to control flows and prevent discharge of unabated flow.  The berm installed along the southern border will contain several openings for stormwater to exit to the off-site drop inlets. Gravel bags and/or walnut wattles will be placed in front of the opening

8

and regularly maintained and/or replaced so as to allow for filtration and settling of stormwater prior to discharge into the storm drains on the adjacent property.

b.      At the Pier 94 Facility, a speed-bump style asphalt berm shall be installed near the gauge area of the tire wash to control flows and prevent the discharge of material off-site.

c.      At the Tidewater Facility, a short speed-bump style asphalt berm shall be installed to control drainage near the first entrance/exit of the Facility. Currently, a straw wattle is located near the low point of a depression located within the impervious area of the site. This shall be replaced by the asphalt berm, which shall feature an approximately one foot gap in the center to facilitate drainage. Gravel bags or walnut weighted wattles shall be placed across this gap and regularly maintained and/or replaced for the purposes of added filtration and flow management.

d.      Berms shall be constructed in such a manner that, in conjunction with the existing berming and sloping at the Facility, stormwater does not discharge from the Facility except at the Designated Discharge Points.  Upon installation of the berms, Hanson shall inspect the perimeter of the Facility to ensure that stormwater cannot be discharged from the Facility at any point other than the Designated Discharge Points.  Hanson shall confirm berm installation in the updated SWPPPs for the Pier 94 and Tidewater Facilties submitted to Baykeeper.

17.     **Hazardous Waste Materials Segregation and Handling**:  After the Effective Date, to the extent not already implemented, Hanson shall implement a system: (1) for identifying any toxic and hazardous materials handled at the Pier 94 and Tidewater Facilities and

9

(2) for segregating such identified materials from other materials at the Facility and storing all such materials under cover and on an impermeable surface, out of potential contact with stormwater or site flooding, with the exception of satellite accumulation stations, which may be located on a permeable surface so long as they are not located near a storm drain inlet or catch basin.  The requirement that hazardous waste materials be stored "under cover" may be satisfied by storage in a covered drum or covered container.  Hanson shall update the SWPPPs for both of the Facilities to reference any Hazardous Materials Management Plans.

18.     **Abandoned or Inutile Equipment Storage and Removal**: After the Effective Date, Hanson shall either store under cover or remove from each Facility all abandoned or broken equipment, scrap metals, or other equipment no longer considered for future use that have the potential to serve as the source for pollutant loading.  This includes areas designated on the Pier 94 and Tidewater Facilities' SWPPPs as "Boneyard Equipment and Parts Storage" as well as any other portion of the Facilities that serves the same purpose.

19.     **Vehicle and Equipment Management**:  After the Effective Date, to the extent not already implemented, Hanson shall implement BMPs to reduce or minimize pollutant release from equipment such as forklifts, hydraulic lifts, dump trucks, and other heavy equipment that are parked or stored in areas of the Pier 94 and Tidewater Facilities from which stormwater discharges.  Such BMPs shall include placing drip pans under equipment stored or parked for a week or longer, weekly inspections for evidence of leaks from such equipment, and promptly (as soon as reasonably possible and in no case later than in advance of forecasted rainfall events) cleaning up of spills, drips, or leaks from such equipment.  Any spilled substances and absorbent materials used in cleaning up spills shall be disposed of in accordance with all local, state, and federal laws and regulations.

10

20.   **Vehicle and Equipment Maintenance**:  After the Effective Date, to the extent not already implemented, Hanson shall not conduct routine (*i.e*., non-emergency) vehicle or movable equipment maintenance or repair at the Pier 94 and Tidewater Facilities in outdoor, uncovered areas from which stormwater discharges during rainfall events.  Whenever Hanson conducts such maintenance or repair activities in non-covered areas from which stormwater discharges from each Facility, Hanson shall inspect the area where the maintenance or repair occurred and clean-up waste products, including pollutant containing fluids, deposited or spilled on the ground as a result of the maintenance or repair.

21.   **Fueling Activities**:  After the Effective Date, to the extent not already implemented, except in unusual and unexpected circumstances where equipment located on a pervious surface has run out of fuel and requires refueling to be operational, Hanson shall conduct fueling activities at the Pier 94 and Tidewater Facilities only on an impervious surface, in accordance with its SWPPP, and require that its fuel supplier or employees immediately clean-up, remove and dispose of any fuel spills in accordance with all applicable local, state, and federal laws and regulations.

22.   **Maintenance of BMP Structural Controls**:  After the Effective Date, Hanson shall maintain structural BMPs at the Pier 94 and Tidewater Facilities in good operating condition during the Wet Season and shall promptly repair any damaged or degraded structural BMPs.

23.   **Amendment of SWPPP**:  Within sixty (60) days of the Effective Date,  Hanson shall amend, and submit to Baykeeper, SWPPPs for the Pier 94 and Tidewater Facilities to incorporate the requirements and BMPs set forth in this Consent Decree pursuant to Paragraphs 2 though 7 above (*e.g*., updated Site Maps, designation of areas, protocol for stormwater sampling)

11

and to incorporate any other requirements of the Industrial Stormwater Permit not already incorporated.  Baykeeper shall have thirty (30) days from receipt of the amended SWPPP for either Facility to propose any changes to that SWPPP.  Within thirty (30) days of notification by Baykeeper of any proposed changes to a Facility's SWPPP and of the reasons for such changes, Hanson shall make all Baykeeper's changes to the amended Facility SWPPP unless Hanson timely invokes Dispute Resolution.  Compliance with the SWPPP for the Pier 94 and Tidewater Facilities, as amended in accordance with this paragraph provision, shall at all times be a requirement of this Consent Decree.

### III.    FACILITY COMPLIANCE MEASURES – SAND WASHING FACILITIES

24.    **Site Maps**:  Within sixty (60) days of the Effective Date, Hanson shall inspect the sand washing portion of the Pier 92 and Tidewater Facilities, and update the Site Maps to indicate all designated discharge points, designated process areas, designated storage areas, sampling locations, and traffic flow as these terms are described and applied in Paragraphs 3-7 and 13 above.  At the Pier 92 Facility, discharges of process water and/or storm water are prohibited except via permitted outfalls.

25.    **Permit Compliance:**  At the Pier 92 and Tidewater Facilities, Hanson shall comply with the Sand Washing Permit, taking all required samples and meeting all effluent and receiving water limitations.  Nothing in this Consent Decree shall limit Hanson's or Baykeeper's right to challenge or otherwise seek modifications to any provision of the Sand Washing Permit or any other permit or order issued with respect to these Facilities.

26.    **Pond Improvements:**  Within ninety (90) days of the Effective Date, at the Pier 92 Facility, Hanson shall improve its settling ponds by cleaning out deposited sediment to allow

for more settling time before the water reaches the final basin.  Hanson shall inspect its settling ponds quarterly and clean out deposited sediment as necessary to maintain settling time.

27.   **Drain Inlet Protection:**  Within thirty (30) days of the Effective Date, at the Pier 92 Facility, Hanson shall implement storm drain inlet protection measures in the vicinity of the storm drain inlet leading to the terminal settling pond, located adjacent to the bay.  Sheet flow from compacted pervious areas shall be directed to a gravel filter berm at least twelve inches high and thirty inches wide, installed consistent with relevant stormwater BMP guidance.   This filter shall be designed to slow down and filter stormwater entering the infiltration basin.  Upon the Effective Date, at the Tidewater Facility, Hanson shall maintain the gravel infiltration basin that receives sand wash process water and stormwater runoff.

28.   **Other Site Improvements:**  Within thirty (30) days of the Effective Date, at the Pier 92 Facility, the existing earthen berm on the northeastern border shall be covered by geo-fabric or its equivalent, speed-bump style asphalt berms shall be installed at the entrances and exits, and the earthen area next to the facility's exit driveway and parallel to the roadway shall be excavated and regularly maintained to facilitate the flow of storm water from the driveway.

## IV.   FACILITY COMPLIANCE MEASURES – ALL FACILITIES

29.   **Training**:  After the Effective Date, and annually thereafter, and within thirty (30) days of hiring of new employees, Hanson shall conduct training for all appropriate employees to explain the requirements of this Consent Decree, the Facility SWPPPs, the Industrial Stormwater Permit, and the Sand Washing Permit to the extent applicable to such employee.  Training shall focus on the employee's role in implementing various Consent Decree measures including, for example, implementation of BMPs, sweeping, or Facility inspections.  Training shall be conducted bilingually (*i.e.,* Spanish/English or other pertinent language) to the extent that such

employee is not reasonably able to comprehend training in English.  Hanson shall integrate any new training requirements resulting from this Consent Decree into the Facility's SWPPP. Hanson shall also update each Facilities' SWPPP to identify the positions responsible for carrying out stormwater management, monitoring, sampling, and SWPPP implementation at each Facility.

## V.   SAMPLING, MONITORING, INSPECTION & REPORTING – STORMWATER

30.   **Sampling Program**:  After the Effective Date, subject to the limitations set forth below,  Hanson shall collect and analyze stormwater samples from each Designated Discharge Point at the Pier 94 and Tidewater Facilities according to the following sampling schedule:

a.      During the Wet Seasons for 2011-2012 ("First Year") and 2012-2013 ("Second Year"), and except as set forth herein, Hanson shall collect and analyze samples from four (4) storm events, as qualified in the General Permit, except that Hanson can collect and analyze storm water discharges after the first hour of discharge during scheduled facility operating hours and samples can be collected on a day which has been preceded by one (1) day of measurable rain (i.e., 0.1 inches or more per day) and at least 24 hours has passed since any previous samples were taken, from each Designated Discharge Point at each Facility, unless a Designated Discharge Point does not discharge that often in a Wet Season, in which case, Hanson shall collect as many samples described above as possible.  If three (3) consecutive samples from a Designated Discharge Point have constituent concentrations below the Target levels set forth in Exhibit 1 for all parameters sampled, Hanson need not conduct additional sampling in that Wet Season.

14

b.      Hanson shall analyze each stormwater sample collected for the presence of each of the parameters listed on the Sampling Chart attached hereto as Exhibit 1.  If Hanson obtains three consecutive samples from each of the Designated Discharge Points at a Facility which are below the Target and Benchmark Levels in Exhibit 1 for a given constituent, Hanson need not have its stormwater from that Facility analyzed for that particular constituent for the remainder of this Consent Decree. Should operations materially change at the either of the Facilities, Hanson shall conduct sampling for any additional toxic priority pollutants listed in 40 C.F.R. § 131.38 likely to be present in Hanson's stormwater discharges as a result of the changed operations.

c.      Where Hanson discharges stormwater into a storm drain inlet or catch basin, Hanson may choose to collect a sample below any insert or treatment system.

31.      **Certified Lab**:  Hanson shall have all stormwater samples collected pursuant to this Consent Decree delivered to a California state certified environmental laboratory for analysis within the time needed for analysis within laboratory method allowable hold times.  The laboratory shall thereafter conduct analysis sufficient to detect individual constituents at or below the levels set forth in the attached Exhibit 1.

32.      **Sample Result Reporting**: Hanson shall provide complete results from Hanson's sampling and analysis to Baykeeper within fourteen (14) calendar days of receipt of the laboratory report from each sampling event.

33.      **Action Plan, Additional Management/Treatment of Stormwater**:  By June 15, 2012 and June 15, 2013, Hanson shall prepare and send to Baykeeper an action plan for the Pier

94 and/or Tidewater Facilities if stormwater sample results for either Facility exceed Benchmark Levels set forth in Exhibit 1 ("Action Plan").

34.     **Contents of Action Plans**: Each Action Plan shall set forth:  (1) a summary chart setting forth all sample results for the Facility from the previous Wet Season, including the constituent concentrations from Designated Discharge Point samples collected at the Facility exceeding the Benchmark Levels in Exhibit 1 ("Exceedances"), (2) the possible sources of such Exceedances, (3) recommended BMPs that attempt to reduce the level of pollutants associated with the Exceedances in future storm water discharges and that satisfy the goal of protecting adopted receiving water quality standards, taking into account factors specified in CWA section 304(b), 33 U.S.C. section 1314(b), including consideration of treatment technology; and (4) a schedule to implement any new BMPS by the earliest practicable time, and before the next Wet Season, if possible.  If Hanson determines that recommended BMPs and/or additional treatment technology will take longer than three (3) months to implement, Hanson shall explain the reasons in the Action Plan.

35.     Baykeeper shall have thirty (30) days from receipt to propose revisions to the Action Plan and explain in writing the basis for each such revision.  Within thirty (30) days of receiving Baykeeper's revisions, Hanson shall adopt Baykeeper's requested revisions to the Action Plan unless Hanson timely invokes Dispute Resolution.

36.     Hanson shall implement the Action Plan(s) adopted pursuant to this Consent Decree as an obligation of this Consent Decree.

37.     Within thirty (30) days after BMPs recommended in an Action Plan pursuant to this Consent Decree are complete, Hanson shall amend its SWPPP to include all BMP Recommendations not otherwise implemented and included in the SWPPP.  Within thirty (30)

days thereafter pursuant to this paragraph, Hanson shall provide Baykeeper with a copy of such revised SWPPP.

38.     During each Wet Season, Hanson is under an ongoing obligation to evaluate the BMPs implemented at the Pier 94 and Tidewater Facilities and discussed in current or previous Action Plans and continue to attempt to reduce the level of pollutants for the remainder of the Wet Season.  Hanson shall use the results from subsequent stormwater samples as they become available to assist with its ongoing evaluation of the effectiveness of BMPs.

39.     **End of Season Summary In Absence of Action Plan**:  If no Action Plan is required pursuant to paragraph 33 for the Pier 94 and Tidewater Facilities, by June 15, 2012 and June 15, 2013, Hanson shall provide Baykeeper an end of season summary report that includes (1) a summary chart with all the sample results from the previous Wet Season; and (2) identification of any new BMPs that Hanson has implemented or will implement not already discussed in prior summary reports or Action Plans.

## VI.    SAMPLING, MONITORING, INSPECTION & REPORTING – SAND WASHING PROCESS WASTEWATER

40.     At the Pier 92 and Tidewater Facilities, Hanson shall collect all samples as required under the Sand Washing Permit.

41.     **Certified Lab:**  Hanson shall have all sand washing process wastewater samples collected pursuant to this Consent Decree delivered to a California state certified environmental laboratory for analysis within the time needed for analysis within laboratory method allowable hold times.

42.     **Sample Result Reporting:**  In accordance with paragraph 47, Hanson shall provide Baykeeper with the quarterly reports submitted to the Regional Water Board, setting forth complete results from Hanson's sampling and analyses under the Sand Washing Permit.

43.     **Sand Washing Action Plan :**  By June 15, 2012 or June 15, 2013, Hanson shall prepare and send to Baykeeper an action plan for the Pier 92 and/or Tidewater Facilities if sand washing sample results in the preceding timeframe (*e.g.,* Effective Date through June 15, 2012, or June 16, 2012 through June 14, 2013) for either Facility exceed the effluent limitations set forth in the Sand Washing Permit ("Sand Washing Action Plan").

44.     **Contents of Sand Washing Action Plan:** An Action Plan shall set forth for each Facility: (1) the exceedance(s) and possible sources of such exceedance(s), (2) recommended BMPs to achieve compliance with the Sand Washing Permit; and (3) a schedule to implement any new BMPs by the earliest practicable time.  If Hanson determines that recommended BMPs and/or additional treatment technology will take longer than three (3) months to implement, Hanson shall explain the reasons in the Action Plan.

**VII.     EXCEEDANCES, SITE ACCESS, & REPORTING**

45.     **Stipulated Payments:** Hanson shall pay the following stipulated payments during the term of this Consent Decree.

    a.  Pier 94 and Tidewater Facilities - Industrial Stormwater Permit

     i.  Five hundred dollars ($500) for each failure to collect a required sample during the Wet Season unless Hanson otherwise provides written documentation supporting the lack of rain events or the opportunity to sample.

    b.  Pier 92 and Tidewater Facilities - Sand Washing Permit

18

      i.      Three hundred fifty dollars ($350) per sample for each failure to collect a sample required under the Sand Washing Permit;

      ii.     Three hundred fifty dollars ($350) each time Hanson fails to complete follow-up sampling required under the Sand Washing Permit when a permit effluent limit has been exceeded.  During periods of intermittent discharge, the follow-up sampling required under the Sand Washing Permit shall be conducted upon recommencement of the discharge;

    c.      Three hundred fifty dollars ($350) per day for every business day (Monday through Friday, excluding state and federal holidays) more than business days (Monday through Friday, excluding state and federal holidays) past the due date that Hanson fails to submit to Baykeeper any document, report or other communication required by paragraphs 23, 33, 37, 39, 42, and 43 under the Consent Decree; and

    d.      Three hundred fifty dollars ($350) per day for every business day (Monday through Friday, excluding state and federal holidays) past the due date that Hanson fails to submit to any payments due under the terms of this Consent Decree.

    e.      All payments of stipulated payments described above shall be paid by June 30th of each year this Consent Decree is in effect to the Rose Foundation for the Environment, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little, with a copy of payment sent concurrently to Baykeeper.  Stipulated payment funds will be used by the Rose Foundation to fund projects that benefit water quality in the San Francisco Bay watershed.  The Rose Foundation will provide in writing to Hanson a

description of how funds were used on a specific water quality project(s).  In no case

shall any of the funds be received by Baykeeper.

46.      **Reduction in Stipulated Payments**:  Hanson shall be allowed a 50% reduction of

any stipulated payments due in any given calendar year pursuant to the preceding paragraph if

Hanson tenders the reduced payment to Baykeeper along with a certification signed under

penalty of perjury stating that Hanson will, within one year, spend or be under contract to spend

the balance of the sum that would otherwise be due as a stipulated payment on alternative

environmental enhancements.  Alternative environmental enhancements shall include:  (a)

completing indoor or covered facilities at the Facilities including the construction of canopies

over processing, operation, or material storage areas; (b) the acquisition of an improved

stormwater filtration system approved by Baykeeper (including any stormwater retention

capacity integrated with the filtration system), or (c) construction and operation of the

appurtenances needed to discharge stormwater runoff from the Facilities to a publicly owned

treatment works sanitary sewer system provided that Hanson includes as part of this sewer

connection project the construction and operation of stormwater retention devices (such as

retention ponds, basins, or tanks) to allow storage of stormwater for disposal after peak rainfall-

related sewer collection system flows have subsided.  Hanson must further submit within thirty

(30) days of completing the foregoing alternative environmental enhancement project a

subsequent notice to Baykeeper explaining how Hanson expended the funds and how this

expenditure met the required terms.  If Hanson fails to meet all conditions of this paragraph, then

it must pay the balance of the stipulated  payment sum not yet paid within twelve (12) months

from the date the payment was originally due.

47.     **Site Access**:  During the term of this Consent Decree, Hanson shall permit representatives of Baykeeper to perform one (1) physical inspection per year of each Facility during operating hours, which may include sampling, and agreed-upon photographing and/or videotaping compliant with applicable Federal Rules of Civil Procedure.  Baykeeper shall provide Hanson notice at least five (5) business days in advance of such physical inspection, and Hanson shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations.  In such case, Hanson shall specify at least three (3) days within the next four (4) weeks upon which a Baykeeper inspection may proceed during normal business hours, and the Parties shall agree upon the inspection date.  Baykeeper shall comply with all  safety instructions provided to Baykeeper by Hanson staff during any site inspection.  Hanson shall not use the period of Baykeeper advance notice pursuant to this paragraph to make any alterations to Facility conditions that Hanson would not otherwise have made but for receiving advance notice of Baykeeper's requested site access such that Baykeeper will be allowed to inspect and sample normally representative Facility conditions and any discharges.

48.     **Reports**:  During the term of this Consent Decree, Hanson shall provide Baykeeper with a copy of all documents submitted to the Regional Water Board or the State Water Board concerning the Facilities and compliance with the Industrial Stormwater Permit and the Sand Washing Permit..  Such documents and reports shall be transmitted to Baykeeper via electronic mail, if feasible, or by U.S. Mail when electronic transmission is not feasible, at the time the documents are due to be submitted to the Regional Water Board or State Water Board.

**VIII.   MITIGATION, FEES, AND COSTS**

49.     **Environmental Mitigation Funding**:  As mitigation of the violations alleged in Baykeeper's Notice and Complaint, Hanson shall pay the sum of thirty-five thousand dollars ($35,000) as follows: (a) twenty-five thousand dollars ($25,000) to the Golden Gate Audobon for wetlands restoration in the areas adjacent to the Pier 92 and Pier 94 Facilities; and (b)  ten thousand dollars ($10,000) to the Rose Foundation for the Environment for projects that will benefit the environment of the San Francisco Bay watershed.  The Rose Foundation shall report the grant funding made with the tendered funds to the Court, U.S. Department of Justice, and the Parties, setting forth the recipient and purpose of the funds.  Payment shall be made to the Rose Foundation for the Environment, 6008 College Avenue, Oakland, California  94618 within thirty (30) days of the Effective Date.

50.     **Reimbursement of Fees and Costs**:  Hanson shall reimburse Baykeeper in the amount of sixty-seven thousand dollars ($67,000) to help defray Baykeeper's reasonable investigation, expert, and attorneys' fees and costs, and all other reasonable costs incurred as a result of investigating the activities at the Facilities related to this Consent Decree, bringing these matters to Hanson's attention, and negotiating a resolution of this action in the public interest. Hanson shall tender payment to Baykeeper within thirty (30) days of the Effective Date.

51.     **Compliance Monitoring Funds:**  Hanson shall reimburse Baykeeper eight thousand dollars ($8,000) per year for each of the two years of the Term of this Consent Decree, in the total amount of sixteen thousand dollars ($16,000) for costs and fees associated with monitoring Hanson's compliance with this Consent Decree. Monitoring activities include site inspections, review of water quality sampling reports, review of annual summary reports, review of Action Plans and other documents submitted pursuant to this Consent Decree, discussion with representatives of Hanson concerning potential changes to compliance requirements, water

quality sampling, informal dispute resolution, and other actions necessary to monitor and ensure Hanson's compliance with this Consent Decree.  The first compliance monitoring fund payment of $8,000 shall be made payable to Baykeeper within thirty (30) days after the Effective Date, and the second compliance monitoring fund payment of $8,000 shall be made payable to Baykeeper within 12 months from the Effective Date.

52.     **Dispute Resolution**: If a dispute under this Consent Decree arises, or either Party believes that a breach of this Consent Decree has occurred, the Parties shall schedule a meet and confer within ten (10) business days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the violation.  If the Parties fail to meet and confer or the meet and confer does not resolve the issue, after at least seven (7) days have passed after the meet and confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including bringing a motion before the United States District Court for the Northern District of California for the limited purposes of enforcement of the terms of this Consent Decree.  The parties shall be entitled to seek fees and costs incurred in any such action pursuant to the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

**IX.     JURISDICTION AND STIPULATION TO DISMISS**

53.     For the purposes of this Consent Decree, the Parties stipulate that the United States District Court of California, Northern District of California, has jurisdiction over the Parties and subject matter of this Action.  The Parties stipulate that venue is appropriate in the Northern District of California and that Hanson will not raise in the future as part of enforcement

23

of this Agreement whether Baykeeper has standing to bring the Complaint or any subsequent action pursuant to the Dispute Resolution procedures herein.

54.     Within three (3) business days of receiving all of the Parties' signatures to this Consent Decree, Baykeeper shall submit this Consent Decree to the U.S. Department of Justice ("DOJ") for agency review consistent with 40 C.F.R. §135.5.  The agency review period expires forty-five (45) calendar days after receipt by the DOJ.  In the event DOJ comments negatively on the provisions of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issues raised by DOJ.

55.     Within ten (10) calendar days of the expiration of DOJ's 45-day review period as provided above, the  Parties will submit this Consent Decree to the District Court, along with a Stipulation and proposed Order that shall provide:

        a.      For dismissal of the Complaint and all claims therein with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2);

        b.      That the Court shall retain and have jurisdiction over the Parties with respect to resolving disputes arising under this Consent Decree; and

        c.      If any court of competent jurisdiction subsequently finds that the Court lacks jurisdiction to resolve any dispute that may arise under this Consent Decree and enforce this Consent Decree in accord with the Court's resolution of the dispute, the Parties stipulate that (1) they will jointly request the Court to set aside dismissal of the Complaint and to reinstate the Complaint for the sole purpose of providing the Court jurisdiction to resolve the dispute and enforce this Consent Decree accordingly and (2) should the Court decline to do so, this Consent Decree shall be deemed a binding contract enforceable as a contract by either the California Superior Court for

24

the County of Alameda or the California Superior Court for the County of San
Francisco.

**X.    WAIVER AND RELEASES**

56.    **Baykeeper Waiver and Release of Noticed Parties and Covenant Not to Sue**:
Upon the Effective Date, Baykeeper, on its own behalf and on behalf of its officers, directors,
employees, members, parents, subsidiaries, affiliates and each of their successors and assigns and
its agents, attorneys, and other representatives covenants not to sue Hanson or its officers,
directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns, or
its agents, attorneys, or other representatives with respect to any storm water or sand wash
processing-related discharges from any of the Facilities that arose before or may arise during the
term of this Consent Decree.  Baykeeper, on its own behalf and on behalf of its officers,
directors, employees, members, parents, subsidiaries, affiliates and each of their successors and
assigns, and its agents, attorneys, and other representatives, releases Hanson or its officers,
directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns, or
its agents, attorneys, and other representatives from and waives all claims raised, or could have
been raised, for matters included in the 60-Day Notice and/or the Complaint, including all claims
for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum
incurred or claimed or which could have been claimed for matters included in the 60-Day Notice
and/or the Complaint and their resolution via this Consent Decree.

57.    **Hanson Waiver and Release of Baykeeper**:  Hanson, on its own behalf and on
behalf of its officers, directors, employees, members, parents, subsidiaries, affiliates, or their
successors or assigns, or its agents, attorneys, and other representatives, releases Baykeeper and
its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their

successors and assigns and its agents, attorneys and other representatives from, and waives all claims which arise from or pertain to the 60-Day Notice and/or the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters included in the 60-Day Notice and/or the Complaint and its resolution via this Consent Decree.

58.     The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

The Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from the allegations and claims as set forth in the 60-Day Notice and/or the Complaint.

59.     **No Admission**:  The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Decree shall be construed as, and Hanson expressly does not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree constitute or be construed as an admission by Hanson of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Decree.

## XI.     MISCELLANEOUS PROVISIONS

60.     **Effective Date**:  The Effective Date of this Consent Decree shall be the date of the District Court's Order granting dismissal of Baykeeper's Complaint and retaining jurisdiction for the enforcement of this Consent Decree.

61.    **Term of Consent Decree**:  The Consent Decree shall continue in effect for a period of two (2) years and two months from the Effective Date, and it shall automatically terminate on that date.  If Hanson no longer requires coverage under the Industrial Stormwater Permit for either the Pier 94 or Tidewater Facilities during the term of this Consent Decree, Hanson shall provide Baykeeper a copy of the Notice of Termination ("NOT") sixty days (60) before Hanson intends to file the NOT with the Regional Board. If Baykeeper disagrees that the filing of the NOT is appropriate, Baykeeper shall timely invoke dispute resolution. The requirements of paragraphs 2-23, 29-39, and 45 no longer apply to the applicable Facility once the NOT is approved by the Regional Board.  If Hanson no longer requires coverage under the Sand Washing Permit for either the Pier 92 or Tidewater Facilities during the term of this Consent Decree, Hanson shall provide Baykeeper a copy of the NOT sixty days (60) before Hanson intends to file of the NOT.  If Baykeeper disagrees that the filing of the NOT is appropriate, Baykeeper shall timely invoke dispute resolution.  The requirements of paragraphs 24-29 and 40-45 no longer apply to the applicable Facility once the NOT is approved by the Regional Board.

62.    **Execution in Counterparts**:  The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

63.    **Construction**:  The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

64.    **Authority to Sign**:  The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

65.     **Integrated Consent Decree**:  All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein.

66.     **Severability**:  In the event that any of the provisions of this Consent Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

67.     **Choice of Law**:  This Consent Decree shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

68.     **Full Settlement**:  This Consent Decree constitutes a full and final settlement of this matter.  It is expressly understood and agreed that the Consent Decree has been freely and voluntarily entered into by the Parties with and upon advice of counsel.

69.     **Negotiated Agreement**:  The Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

70.     **Modification of the Agreement**: This Consent Decree, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the Parties.

71.     **Assignment**:  Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties, and their successors and assigns.

72.     **Mailing of Documents to Baykeeper/Notices/Correspondence**:  Any notices or documents required or provided for by this Consent Decree or related thereto that are to be

28

provided to Baykeeper pursuant to this Consent Decree shall be, to the extent feasible, sent via

electronic mail transmission to the e-mail addresses listed below or, if electronic transmission is

not feasible, via U.S. Mail or hand delivery to the following addresses:

Baykeeper:

Andrea Kopecky
San Francisco Baykeeper
785 Market Street, Suite 850
San Francisco, CA 94103
E-mail:  andrea@baykeeper.org

With copies sent to:

Jodene Isaacs
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
E-mail:  jisaacs@enviroadvocates.com

Unless requested otherwise by Hanson, any notices or documents required or provided

for by this Consent Decree or related thereto that are to be provided to Hanson pursuant to this

Consent Decree may be provided by electronic mail transmission to the e-mail addresses listed

below, or alternatively may be sent by U.S. Mail to the addresses below:

Hanson:

Mike Bishop
Marine Operations Manager, Northern California Hanson Aggregates
Lehigh Hanson West Region
4501 Tidewater Avenue
Oakland, CA 94601
Tel: 510-261-8573
Fax: 510-534-7418
Email: Mike.Bishop@hanson.com

With copies sent to:

John A. Gillan
Deputy General Counsel – US Operations
Lehigh Hanson, Inc.

300 East John Carpenter Freeway
Suite 1800
Irving, TX 75028
Tel: 972-653-5572
Fax: 972-653-6185Email: John.Gillan@hanson.biz

Nicole E. Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4601
Tel: 916-444-1000
Fax.: 916-444-2100
E-mail: ngranquist@downeybrand.com

     73.    **Facsimile Signatures**:  The Parties' signatures to this Consent Decree transmitted by facsimile or electronic mail transmission shall be deemed binding.

     74.    **Impossibility of Performance**:  No Party shall be considered to be in default in the performance of any of its obligations under this Consent Decree when performance becomes impossible, despite the timely good faith efforts of the Party, due to circumstances beyond the Party's control, including without limitation any act of God, war, fire, earthquake, flood, and restraint by court order or public authority.  "Circumstances beyond the Party's control" shall not include normal inclement weather, economic hardship or inability to pay.  Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the impossibility of performance.

     75.    If for any reason the DOJ or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the DOJ or the District Court.  If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the District Court, this Consent Decree shall immediately be

null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408.

76.     The settling Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

BAYKEEPER

Date: Aug. 25 , 2011

by:  Jason Flanders
     San Francisco Baykeeper

HANSON

Date: August 25 , 2011

by:  M. F. Roth

APPROVED AND SO ORDERED, this 4th day of November, 2011 _____.

UNITED STATES DISTRICT JUDGE

by: _____



IT IS SO ORDERED

Judge Edward M. Chen

31

**EXHIBIT 1**

**Target and Benchmark Levels for Hanson's Stormwater Sampling**

| Constituent | Target Levels (Water Quality Standards) | Target Reference | EPA Benchmark Values | EPA Analysis Method or Minimum Detection Limit |
|---|---|---|---|---|
| **Total Suspended Solids** | | *Proposed Best Available Technology (BAT) Limits for Scrap Yard Stormwater Discharges[1]* | 100 mg/L | Method 160.2 |
| **Oil and Grease** | | *Proposed BAT Limits for Scrap Yard Stormwater Discharges* | 15 mg/L | Method 418.1 or Method 1664 |
| **pH** | 6.5 to 8.5 | *SF-RWQCB Basin Plan, all surface waters* | 6.0-9.0 | Method 9040b |
| **Copper** | 0.0094 mg/L | *SF-RWQCB, Table 3.3-A, Basin Plan, Salt Water* | 0.0636 mg/L | 0.003 mg/L |
| **Iron** | | *EPA NAWQC- EPA Stormwater Benchmark* | 1.0 mg/L | 0.1 mg/L |

[1] International Stormwater Best Management Practices (BMP) Database Project 1999-2005, Analysis of Treatment System Performance, February 2006. Available at http://www.bmpdatabase.org/downloads.htm.